## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| NARESSA COFIELD, | CIVIL ACTION NO. 2:21-CV-02223 |
| *Plaintiff* | JUDGE LANCE M. AFRICK |
| v. | |
| KIPP NEW ORLEANS, INC., RHONDA KALIFEY-ALUISE, in her individual and official capacity, and OCTAVE LAROCHE, in his individual and official capacity, and THE HANOVER INSURANCE COMPANY, | MAG. JUDGE DANA M. DOUGLAS |
| *Defendants* | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff Naressa Cofield, by and through undersigned counsel, to file this Amended Complaint against Defendants. In support, she states the following:

### I.      INTRODUCTION

1.      For years, KIPP New Orleans, Inc. regarded Dr. Cofield as one of their standout employees. She was liked by her co-workers for her intellect, congenial attitude, and commitment to KIPP's mission, and she was well-known and respected within the organization for her advocacy for racial equality. After years of success with KIPP, Dr. Cofield began to question whether she and other Black women were paid less than their white and male peers. She expressed her concerns about the pay inequities to Mr. LaRoche, and others, and advocated for raises, and in turn, was summarily terminated by Octave ("Joey") LaRoche. The reason Mr. LaRoche gave for her termination was blatantly pretextual: he accused her of sharing "confidential" salary information.

In reality, this salary information was not confidential, but was freely available as public records. The salary information showed that Black women were being paid less than white and male peers. After her termination, KIPP failed to provide Dr. Cofield with her notification of her right to COBRA coverage, and later, employer-paid COBRA coverage, despite federal law mandating they do so. As a result, a host of Dr. Cofield's rights under federal and state law were violated, resulting in substantial emotional and economic injuries.

## II.      JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Dr. Cofield's federal claims arise under the Constitution and the laws of the United States. This Court has jurisdiction over Dr. Cofield's state law claims in accordance with 28 U.S.C. § 1367.

3.      Venue is proper in this district under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed in the Eastern District of Louisiana, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in Orleans Parish, Louisiana, situated in the Eastern District of Louisiana.

## III.      PARTIES

4.      Plaintiff **NARESSA COFIELD** is an individual of suitable age and capacity to file this suit. At all relevant times to this suit, Dr. Cofield resided in Orleans Parish in the Eastern District of Louisiana. She worked for KIPP, in New Orleans, Louisiana during the time relevant to this Complaint.

5.      Defendant **KIPP NEW ORLEANS, INC.** ("KIPP") is a non-profit organization incorporated under the laws of the state of Louisiana and located in Orleans Parish in the Eastern District of Louisiana. KIPP New Orleans, Inc. is affiliated with the Knowledge is Power Program, which is a national network of tuition-free, public charter schools in low-income communities and is the country's largest network of public charter schools. Defendant KIPP was established in 2005

for the purpose of operating public charter schools in New Orleans under the jurisdiction of the Orleans Parish School Board. The state Board of Elementary and Secondary Education approved the granting of charters to KIPP to operate public schools in New Orleans. All public schools in New Orleans, Louisiana are charter schools supervised by the Orleans Parish School Board. Now, Defendant KIPP currently operates eight public schools in New Orleans, which enroll over 6,000 students in grades Pre-Kindergarten through 12. KIPP's operation of these public schools is supervised by the Louisiana Board of Elementary and Secondary Education and the Louisiana Department of Education. KIPP directly receives over $23,000,000 a year in Louisiana state public school funds. Enrollment for KIPP schools is overseen and administered through the Orleans Parish School Board system. La.R.S. Section 17:1392 et seq. defines charter schools in Louisiana as "public schools[.]" KIPP performs a public function by providing public education funded by state and federal funds, without the payment of any private tuition, an essential state function, and therefore, is functioning as a public actor under the color of state law. Defendant KIPP receives over $15,000,000 a year in federal financial assistance, which it used for the sole purpose of operating the school, including the payment of staff salaries. Dr. Cofield's salary was also supported by federal funds. KIPP employs over 860 individuals in New Orleans, Louisiana, including 60 employees in its regional office. KIPP New Orleans Inc. is a named insured on the policy for insurance coverage between KIPP New Orleans Schools and The Hanover Insurance Company.

6.     Defendant **RHONDA KALIFEY-ALUISE** was a supervisor of Dr. Cofield and worked for Defendant KIPP at all times relevant to this Complaint as the Executive Director. On information and belief, Ms. Kalifey-Aluise is domiciled in Orleans Parish in the Eastern District of Louisiana. She is sued in her individual and official capacity.

7.      Defendant **OCTAVE ("JOEY") LAROCHE** was a supervisor of Dr. Cofield and worked for KIPP at all times relevant to this Complaint as the Chief Strategy Officer. On information and belief, Mr. LaRoche is domiciled in Orleans Parish in the Eastern District of Louisiana. He was a supervisor of Dr. Cofield and an employee of KIPP. He is sued in his individual and official capacity.

8.      Defendant **THE HANOVER INSURANCE COMPANY ("Insurer")** is a foreign insurance company domiciled in New Hampshire, and registered in Louisiana with its address for service with the Louisiana Secretary Of State at 8585 Archives Avenue in Baton Rouge, LA 70809. The Hanover Insurance Company provided a policy of insurance coverage on behalf of Defendant KIPP, at all times described herein.

## IV.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      On January 21, 2021, Dr. Cofield timely filed an Equal Employment Opportunity Commission (EEOC) Charge of Discrimination alleging race and sex discrimination and retaliation by Defendant KIPP.

10.      On March 31, 2021, Dr. Cofield filed a First Amended EEOC Charge of Discrimination, which added hostile work environment claims and violations of the Equal Pay Act to her original Charge.

11.      Dr. Cofield requested a Notice of Right to Sue on November 11, 2021, after more than 180 days had elapsed since the EEOC assumed jurisdiction over her Charge of Discrimination.

12.      On November 18, 2021, the EEOC issued a Notice of Right to Sue pursuant to Dr. Cofield's request.

13.       This Complaint is being filed within 90 days of Dr. Cofield's receipt of the EEOC's Notice of Right to Sue.

14.     Dr. Cofield has fully complied with all prerequisites to jurisdiction in this Court under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII") and the Louisiana Employment Discrimination Law ("LEDL").

**V.     FACTS**

**A.     Dr. Cofield is a Talented and Skilled Educator with More Than a Decade of Professional Experience in Education Policy and Strategy.**

15.     Dr. Cofield, a Black woman, is an accomplished educator with an extensive professional background in education policy, strategy, and talent.

16.     She holds a Ph.D. and an M.S. from Purdue University's School of Civil Engineering, a Master of Arts in Teaching (M.A.T.) from the Relay Graduate School of Education, and a Master of Education Degree (M.Ed.) from the Broad Center for the Management of School Systems.

17.     Dr. Cofield began her work in education in 2010 with The Broad Residency in Urban Education at the Louisiana Department of Education, where she oversaw the development of the State's educator support and evaluation system, led district- and state-wide school turnaround efforts, and worked on obtaining over $35 million in educational grants.

18.     Dr. Cofield subsequently served as the Director of Excellence in Programming for the Choice Foundation for four years.

**B.     Dr. Cofield Joined KNOS in 2017 and Immediately Became One of its Star Employees.**

19.     Dr. Cofield applied to participate in KIPP's two-year teacher residency program, which allowed her to earn both her M.A.T. and her teaching certification while simultaneously gaining intensive firsthand experience in the classroom to further deepen her educational policy and strategy expertise. In 2017, KIPP hired Dr. Cofield as a Resident, and she began working as a

Fourth Grade Humanities teacher at KIPP Leadership Primary in New Orleans, Louisiana, one of the schools in KIPP's charter network.

20.     Dr. Cofield immediately excelled in the classroom, and at the end of her first year of teaching, she was a finalist for KIPP's Rookie of the Year Award.

21.     Dr. Cofield obtained her teacher certification in elementary education in 2018. On June 30, 2019, Dr. Cofield successfully completed her two-year residency with KIPP, and she earned her M.A.T. in Special Education.

22.     When Dr. Cofield's teaching role concluded at the end of her two-year residency, KIPP quickly recruited her to continue working for the organization due to her success in the classroom and impressive professional background.

23.     On July 22, 2019, KIPP formally offered Dr. Cofield a full-time position as Director of Talent Strategy, a role that she was eminently qualified for based on her extensive academic and professional background in classroom teaching, education policy, and talent, teacher, and leader effectiveness. Monique Maldonado, KIPP's Director of Human Resources at the time, advised Dr. Cofield that her annual salary in this role would be $75,000.

24.     Dr. Cofield was surprised by the relatively low starting salary offered by KIPP, as she had earned between $20,000 to $40,000 more per year in substantially similar positions she previously held at other non-profit organizations and state agencies. Assuming all KIPP salaries were paid below market value due to the organization's nonprofit status, Dr. Cofield accepted the role based on her positive experiences in the classroom during her KIPP residency.

25.     As Director of Talent Strategy, Dr. Cofield was supervised by Defendant Octave ("Joey") LaRoche (Black male), Chief Strategy Officer for KIPP at all times relevant to this Complaint.

26.     In addition to Dr. Cofield, Mr. LaRoche also supervised Kevin Barnes (Black male), Managing Director of Engagement; Curtis Elmore (Black male), Director of Communications; Bridget Burns (Black female), Director of Recruiting; and Amani Khabeer (Black female), Talent Strategy Manager.

C.     **Despite Dr. Cofield's Accomplishments and Exemplary Performance at KNOS, She Was Vastly Underpaid Compared to Her Peers.**

27.     Dr. Cofield immediately made a positive impact after returning to KIPP in her new role. In her first month of employment alone, she implemented a new teacher evaluation rubric and data observation collection tool that improved the reporting and analysis of teacher performance data.

28.     From the beginning, Dr. Cofield did not hesitate to take on any additional job duties that would further KIPP's stated mission of "racial justice and equitable opportunity for . . . students, families, and staff." For instance, when the Director of Coaching and Development left her position with KIPP in September 2019, Dr. Cofield assumed about 25% of her job duties, including the roll-out and norming of the new teacher evaluation rubric. Soon afterward, KIPP's Director of Data left the organization, and Dr. Cofield again filled the void by completing all end-of-year data analyses.

29.     As a result of these additional job duties, Dr. Cofield had to work between 60 to 70 hours a week on average. She received no additional compensation for performing these additional job duties.

30.     In December 2019, Dr. Cofield was shocked to learn that, despite her hard work, commitment, and continuing success, she was one of the lowest-paid director-level employees at KIPP. Most KIPP employees with her level of job responsibilities – many of whom were male, or Caucasian, and did not hold doctorate degrees – were paid $90,000 or more per year on average.

31.     Dr. Cofield also discovered that she and the other Black female employees supervised by Mr. LaRoche were paid thousands of dollars less per year than their similarly situated male peers.

32.     Dr. Cofield only earned a salary of $75,000 in the 2019-2020 academic year, despite holding a doctorate degree and having years of experience working for KIPP both in the classroom and in the School Support Center.

33.     Similarly, Bridget Burns (Black female) held a Masters' Degree and had served as KIPP's Director of Recruiting since October 2017. She earned a salary of $80,676.15 in the 2019-2020 academic year.

34.     Amani Khabeer (Black female), Talent Strategy Manager, held a Bachelor of Science and had worked for KIPP since September 2018. She earned a salary of $62,229.62 in 2019-2020.

35.     In contrast, Curtis Elmore (Black male), Director of Communications, held a B.A. in Marketing and had only started working for KIPP in May 2019. Nonetheless, Mr. Elmore earned a starting salary of $87,300 during the 2019-2020 academic year – nearly 15% more than the salary KIPP paid to Dr. Cofield, and 10% higher than Ms. Burns', even though they had worked at KIPP longer than Mr. Elmore and had more extensive educational experience.

36.     Jonathan Bertsch (white male), Mr. Elmore's predecessor as Director of Communications, held a Master of Education degree. Prior to his departure from KIPP, Mr. Bertsch was paid an annual salary of $93,486.74 – approximately $12,810 more than Ms. Burns, who also held an M.Ed., and nearly $18,500 more than Dr. Cofield, who held an M.Ed. and a doctorate degree.

37.     Kevin Barnes (Black male), Managing Director of Engagement, held a B.A. in Mass Communications and only began working in this position in December 2018. He earned a salary of $100,600.08 during the 2019-2020 academic year.

38.     Based on these discrepancies, Dr. Cofield realized her compensation needed to be increased, particularly considering the praise she continued to receive from her supervisors. In December 2019, for example, Todd Purvis, Chief Academic Officer, had commended her excellent data skills, and Rhonda Kalifey-Aluise, Chief Executive Officer, praised her leadership abilities after that month's Talent Review. Other praise for Dr. Cofield's performance soon followed. In January 2020, Joey LaRoche, Chief Strategy Officer, praised her performance and acknowledged that she was actually performing job duties equivalent to one-and-a-half full-time positions. Given her achievements in her new role, Dr. Cofield was hopeful that KIPP would increase her salary to a more equitable amount if she raised the issue.

**D.     KIPP's Decisionmakers Repeatedly Refused Dr. Cofield's Requests for Equitable Compensation.**

39.     In January 2020, Dr. Cofield asked to speak to Mr. LaRoche about her compensation in their next one-on-one weekly check-in, but he never gave her a chance to do so. She then added the compensation conversation to the written agenda for their next weekly check-in.

40.     Despite this, Mr. LaRoche failed to discuss compensation with Dr. Cofield at their next meeting. Mr. LaRoche continued to ignore the one-on-one agenda items regarding Dr. Cofield's compensation throughout March and April 2020.

41.     On April 22, 2020, Dr. Cofield finally insisted upon having a conversation about her inequitable salary with Mr. LaRoche. Dr. Cofield coupled her request for a raise with a PowerPoint presentation proposing a structural reorganization that would not only support her

requested equal salary but would actually save KIPP money overall. However, Mr. LaRoche refused to consider Dr. Cofield's request, claiming that KIPP's funds were limited as a result of the coronavirus pandemic. He also stated that it was "uncommon" for KIPP to give employees significant pay raises, even in normal years. Mr. LaRoche further advised Dr. Cofield that, due to the pandemic, no KIPP employees would be receiving a raise in 2020 – not even the customary annual 2% cost-of-living salary adjustment.

42.    Despite Mr. LaRoche's representations, many of Dr. Cofield's white female colleagues and other male employees at KIPP not only received raises in 2020, but they also received raises that far exceeded a 2% salary increase, often while maintaining the same job title, including:

   a.   Amanda Cole (white female), Math Achievement Director (17.39% raise);

   b.   Emily Maletic (white female), Math Achievement Director (16.71% raise);

   c.   Sharon Marcus (white female), Achievement Manager (13.49% raise);

   d.   Aron Walker III (Black male), Director of School Operations at KIPP-operated John F. Kennedy High School (10.75% raise);

   e.   Jessica Taylor (white female), Director of Special Education (10.56% raise);

   f.   Monica Vaughn-Flam (white female), English Language Learner Manager (8.25% raise).

43.    Other male and white female KIPP employees were promoted and compensated accordingly, despite the ongoing pandemic, including Patrick Doyle (white male), who received a 10.82% raise after being promoted from Data Coordinator to Student Systems Analyst, and Breanna Gavini (white female), who received a 24.20% raise after being promoted from Data Analyst to Interim Director of Data, Assessment & Accounts.

44.     Despite KIPP's refusal to increase her compensation, Dr. Cofield remained a committed employee. She served on additional grant teams in April 2020 and implemented new teacher preparation policies the same month.

45.     In May 2020, in preparing a proposal for the new Teacher & School Leader (TSL) federal grant funding, Mr. LaRoche proposed hiring several new employees at starting salaries higher than Dr. Cofield's annual salary.

46.     On May 21, 2020, Dr. Cofield asked Mr. LaRoche if he would consider including a salary raise in their calculations of how to utilize the new TSL grant money.

47.     On May 26, 2020, Mr. LaRoche responded that he would be willing to hear a "compelling case for why" Dr. Cofield deserved a raise, but once again claimed that KIPP was considering eliminating pay raises for current employees altogether for the upcoming academic year.

48.     In response to Mr. LaRoche's request for more information, during a May 29, 2020 phone call, Dr. Cofield walked Mr. LaRoche through another PowerPoint presentation detailing her success as KIPP's Director of Talent Strategy, her collaborative work with other key members of KIPP's "People Team," her professional accomplishments, her commitment to furthering the organization's goals, and her dedication to effecting change in New Orleans' public schools. Dr. Cofield's PowerPoint also provided factual support showing the blatant wage disparities between KIPP's Black female employees and their white and male colleagues, such as one slide, titled "Wage Disparity," which noted that "[i]n America, Black women make $0.62 for every $1 white men make" and "[i]n Louisiana, it is $0.47." Dr. Cofield also noted that the average KIPP director salary was $94,514.17, nearly $20,000 more than her annual salary. She then highlighted four

white peers in director-level positions who were paid $5,000 to more than $32,000 more than her each year.

49.     In a KIPP grant proposal in May 2020, Mr. LaRoche refused to include a raise for Dr. Cofield, despite knowing that KNOS had yet to allocate $600,000 to $800,000 of the new grant funds.

50.     Over the next several months, Dr. Cofield continued to add to her list of accomplishments. She led cost-saving initiatives by negotiating workshop pricing for the Standards Institute, Together Leader, and Teach Like a Champion. Further, she led certification efforts and was training the Human Resources team on state certification policies and processes. She revamped and expanded the Teacher Residency program to increase retention, automated the Talent Management Scoring and Analysis Tools for Talent Review, and led efforts to obtain additional funding. In June 2020, she obtained a $600,000 grant from NOLA Public Schools.

**E.     KIPP Continued to Ignore Dr. Cofield's Requests for an Equal Salary While Publicly Announcing Its Commitment to Equitable Hiring Policies.**

51.     On June 17, 2020, Rhonda Kalifey-Aluise, Executive Director of KIPP, sent an e-mail to all KIPP employees and staff emphasizing the organization's commitment to adopting "equitable hiring and promotion policies." In the same e-mail, Ms. Kalifey-Aluise announced that KIPP would be "mov[ing] forward with annual teacher compensation step increases . . . [and] non-instructional cost of living adjustment" for school support center employees such as Dr. Cofield.

52.     The next day, at KIPP's June 18, 2020 School Board meeting, Ms. Kalifey-Aluise announced that KIPP was "urgently executing" work concerning "diversity, equity, and inclusion [DEI]." Mr. LaRoche reported that KIPP was training employees "on equitable hiring processes . . . to better eliminate bias," and Ms. Kalifey-Aluise stated that KIPP would be "revisit[ing] its existing DEI plan, examin[ing] organizational practices, and gather[ing] feedback to advance the

work of becoming a more anti-racist organization." Ms. Kalifey-Aluise and Mr. LaRoche also detailed KIPP's plan to work with "DEI consultants" to "lead . . . school leadership teams through planning a school-based equity agenda for the upcoming year."

53.     On July 9, 2020, Mr. LaRoche offered Dr. Cofield a $10,000 stipend, but only if she agreed to serve as the coordinator of KNOS's diversity, equity, and inclusion ("DEI") activities in addition to all her other job duties.

54.     On July 10, 2021, Dr. Cofield responded to Mr. LaRoche that she was already performing the work of one and a half people and could not take on these DEI responsibilities, which would require an additional 10 to 15 hours of work per week, for a one-time stipend. However, she advised Mr. LaRoche that she would be glad to accept these duties in exchange for a corresponding increase in her base compensation. She also expressed her concern that her disproportionately low salary "is not commensurate with [her] experience, expertise and impact, and highlights race and gender gaps at the Director level."

55.     Later on July 10, 2020, Mr. LaRoche admitted that Dr. Cofield was performing exceptionally but denied her request for a raise.

56.     On the same day, Dr. Cofield emailed Ms. Kalifey-Aluise requesting a meeting to discuss her role and responsibilities at KIPP. However, Ms. Kalifey-Aluise never acknowledged or responded to her email.

**F.     Dr. Cofield Attempted to Assist Other Underpaid Black Female Employees with Requesting Equal Salaries.**

57.     KIPP's public-facing commitment to equity and diversity while, at the same time, silencing any complaints about KIPP's employment practices from Black female employees, merely strengthened Dr. Cofield's determination to close the organization's wage gap.

13

58.     Motivated by her own struggle to achieve equal pay, Dr. Cofield began to assist other underpaid Black women with requesting additional compensation from KIPP.

59.     In October 2020, Jenni Seckel, Principal of KIPP Leadership Primary, reached out to Dr. Cofield to discuss Lenore "Missy" Scott, an exceptional Black educator who Dr. Cofield had met while teaching at KIPP. Ms. Scott was a New Orleans native and high-performing teacher with an unwavering commitment to her students who has had a profound impact on student achievement and her school's culture. Ms. Scott was working to earn her bachelor's degree while teaching and, upon conferral of her degree, would be eligible to move from the paraprofessional pay scale to the teacher pay scale. Dr. Cofield agreed with Ms. Seckel who believed Ms. Scott should receive the increased salary of a third-year teacher, instead of a first-year teacher, upon receipt of her degree due to her exemplary performance in the classroom over the past three years.

60.     On October 21, 2020, Dr. Cofield discussed Ms. Scott's compensation with Mr. LaRoche, explaining that Ms. Scott was a smart, strong, and successful employee, an excellent role model for her students, and exactly the type of educator KIPP should prioritize for retention. When Mr. LaRoche asked for additional information, Dr. Cofield responded with a detailed email describing Ms. Scott's many accomplishments, quantifying Ms. Scott's profound impact on her students' MAP scores and reading fluency. Dr. Cofield also emphasized that it would "cost KNOS and kids more in the long run to recruit, hire, train, and develop someone who is as committed, having [a] positive impact, and on the same trajectory as Missy."

61.     In their subsequent one-on-one meetings, Mr. LaRoche said that he had not reviewed the ample additional information Dr. Cofield had provided in support of Ms. Scott's raise.

62.     In another meeting, Mr. LaRoche said he did not think Ms. Scott could receive the third-year teacher raise due to state law and finance audit findings prohibiting this type of salary increase. Dr. Cofield continued to follow up with Mr. LaRoche in their one-on-one meetings.

63.     On November 4, 2020, Mr. LaRoche said that he still had not reviewed the additional information supporting Ms. Scott's raise and that it would take a year to review compensation to identify other teachers in a similar situation.

64.     On November 10, 2020, Dr. Cofield re-sent Mr. LaRoche the additional information to support Ms. Scott's raise.

65.     On November 18, 2020, Dr. Cofield followed up with Mr. LaRoche regarding the request to increase Ms. Scott's salary. However, Mr. LaRoche again claimed that state law and finance audit findings prevented him from paying her as a third-year teacher.

**G.     KNOS Retaliated Against Dr. Cofield for Discussing its Discriminatory Compensation with Other Employees by Abruptly Terminating Her Employment.**

66.     Dr. Cofield's attempts to help Ms. Scott only strengthened her determination to help not just herself, but also other Black female employees, achieve pay equity. In response, Mr. LaRoche swiftly targeted Dr. Cofield for termination. Nonetheless, Dr. Cofield remained committed to ensuring that KNOS's public funds were used to pay her and other employees equally, regardless of race or gender.

67.     On December 2, 2020, Mr. LaRoche informed Dr. Cofield he had "great feedback" for her in her upcoming evaluation, referred to as a "360 Survey." Dr. Cofield asked about Ms. Scott's salary again. Mr. LaRoche informed Dr. Cofield that Ms. Scott would be paid as a first-year teacher. Dr. Cofield also complained to Mr. LaRoche that she and Bridget Burns, a Black woman, and the Director of Recruitment, were paid less than Curtis Elmore, Communications

Director, who was male and had less education and experience. Despite sharing this information with Mr. LaRoche, he refused to increase either woman's salary.

68.    After that meeting, Dr. Cofield informed Ms. Scott's supervisor, Ms. Seckel, that she was unable to assist Ms. Scott in getting a higher salary.

69.    On December 3, 2020, Dr. Cofield and Ms. Mills discussed Cheryl Flotte, and Dr. Cofield agreed to see if she could help Ms. Flotte get a performance stipend for her outstanding work that year.

70.    The same day, Dr. Cofield spoke to Francis Giesler, School Leader Coach, to get her final approval on teacher leader stipends for schools she supports. She asked Ms. Giesler to approve the stipend for Ms. Flotte. Previously, when Dr. Cofield asked, Mr. LaRoche refused to grant Ms. Flotte a stipend, claiming he could not because she was a paraprofessional. However, Mr. LaRoche approved the same type of stipend for a male paraprofessional teacher and football coach. Ms. Giesler agreed to the stipend and shared with Dr. Cofield her concerns with KNOS's "confidential" salary policy, her inability to support school-based salary decisions as a senior leader, as well as her shock and frustration regarding Ms. Scott only being eligible for a first-year teacher salary despite her years of positive impact. During that conversation, Dr. Cofield also shared her concerns about Ms. Scott's salary and that she and Ms. Burns were also underpaid based on race and gender. Ms. Giesler asked for all related documentation and Dr. Cofield immediately provided her relevant emails and data regarding her concerns.

71.    Ms. Giesler agreed to discuss the issue with Mr. Purvis. Just hours later, on the evening of December 3, 2020, Mr. LaRoche informed Dr. Cofield he was "digging into the Missy [Scott] situation with HR."

72.     At 8:16 AM the next day, Mr. LaRoche sent Dr. Cofield a text message ordering, "Give me a call now. Need to talk to you." Soon after, Mr. LaRoche and Dylan Penny, Director of Human Resources, terminated Dr. Cofield, effective immediately. Mr. Penny informed her she was being terminated for sharing "confidential salary information" of other KIPP employees, which he alleged to be unprofessional and a breach of confidentiality.

73.     On December 7, 2020, Dr. Cofield asked Mr. Penny to confirm that she was terminated for "sharing confidential salary information for other employees, specifically a salary analysis/comparison, across the region?" He responded that she was terminated for a "breach of confidentiality and showing lack of professionalism.

74.     The same day, Dr. Cofield received results from the 360 Survey in which Mr. LaRoche noted that: "I consistently tell people that Naressa knows how to unravel complicated things and push forward a large amount of work." Numerous reviewers commented on Dr. Cofield's commitment to diversity, equity, and inclusion, and noted her efforts to work toward those goals during her employment.

**H.      Soon after her Termination, KIPP admitted the Salary Information was Not Confidential**

75.     Further, Dr. Cofield's attorneys submitted a Public Records Request on behalf of Dr. Cofield on January 8, 2021, to Kevin Barnes, KIPP records custodian. Among other documents, the request asked for "[a]ll salary data for all teachers, administrative and support staff, and any other individuals employed by KIPP[.]" In response, KIPP's counsel responded that "[h]aving reviewed your request, KIPP New Orleans School ("KNOS") does not claim an exemption from disclosure." When the records were produced, they contained vast amounts of salary data for the same salaries that KIPP alleged were "confidential" when it terminated Dr. Cofield.

76.     The public records, and the EEOC Position Statement submitted by KIPP, revealed even more information regarding the failure to pay Dr. Cofield equal to her peers. For example, Kevin Barnes, a Black male who also reported to Mr. LaRoche as the Managing Director of Engagement, made at least $25,000 more than Dr. Cofield per year. Similarly, Curtis Elmore, another Black male who reported to Mr. LaRoche, served as the Director of Communication and was paid $12,000 more than Dr. Cofield. Mr. Elmore's predecessor, a white male, Jonathan Bertsch, was paid $18,487 more than Dr. Cofield.

77.     In its EEOC Position Statement, KIPP also admitted that it fired Dr. Cofield for seeking a 2% pay raise for herself and Ms. Burns.

**I.      KNOS Continued to Retaliate Against Dr. Cofield After She Was Wrongfully Terminated.**

78.     The same day as her termination, KIPP promised to provide information related to her COBRA coverage election rights, as required by federal law. That notification was required by federal law to be delivered to Dr. Cofield by January 22, 2021. However, KIPP failed to timely provide Dr. Cofield with notification of her right to COBRA coverage.

79.     On March 13, 2021, the EEOC notified Defendants that Dr. Cofield had filed a Charge of Discrimination against KIPP. Two days later, on March 15, 2021, Defendant Kalifey-Aluise downloaded Dr. Cofield's EEOC Charge of Discrimination.

80.     After learning about Dr. Cofield's EEOC Charge, Defendants continued withholding information regarding Dr. Cofield's right to COBRA coverage for months.

81.     On June 7, 2021, Dr. Cofield finally received her right to COBRA coverage for the first time. That notification also contained belated notification of her right to employer-paid coverage under the ARPA, and notification regarding those rights was due to Dr. Cofield by May 31, 2021.

J.      **Defendants Targeted Other Black Women as Well**

82.    Other female and Black employees also experienced discrimination while working at KIPP. For example, at KIPP Believe Primary ("KBP"), successive white leaders were placed in positions of power by Defendants and enacted policies that discriminated against Black female teachers like Danielle Matthews. From 2017 to 2019 she was given more difficult students to manage, expected to utilize more rigorous discipline with those students, and then denied assistance when they requested it. Ms. Matthews noticed that the white leadership passed up Black teachers for lower-level leadership positions in favor of white candidates. In November 2019, Ms. Matthews (complained to Rachael Parker (white female), Principal of KBP, about the lack of administrative support she was receiving for her special education students, who had severe disabilities and required constant intensive care. Ms. Matthews also expressed concern regarding KIPP's pattern of incorrectly assigning children with behavioral issues to her self-contained special education classroom in violation of their Individual Education Plans (IEPs), which required placement in a general classroom with the assistance of a paraprofessional. Ms. Parker never responded to her concerns, and instead disciplined Ms. Matthews by placing her a Personal Improvement Plan. When Ms. Matthews pointed out that this severe level of discipline violated KIPP's progressive discipline model, Ms. Parker merely told Ms. Matthews that she "should have known better." Ms. Parker subsequently denied Ms. Matthews' requests for a pay increase and, despite Ms. Matthews' positive peer reviews and the excellent performance of her students, selected white employees with less experience for promotions instead of Ms. Matthews. Exhausted with the constant retaliation for voicing her concerns, Ms. Matthews left her employment with KIPP.

83.     Black teachers at KIPP Leadership Primary experienced similar discrimination. For example, Jessica Lamb, a Black woman, reported race discrimination and retaliation to Libby Bain, Director of Talent Acquisition in 2017 when she was pushed out of her position as a teacher.

84.     The same pattern existed for those who work in administration like Dr. Cofield. For example, Neia Limar (Black female), former Executive Assistant to KIPP's executive officers, including Ms. Kalifey-Aluise and Mr. LaRoche, was retaliated against after she resigned from a second position as a Spanish teacher in January 2020 upon learning that she would be expected to work for no pay. Ms. Limar initially accepted the second job and asked what compensation she would receive for this additional position. KIPP did not respond before classes began. Nonetheless, Ms. Limar was eager to help KIPP's students, and she began teaching the class anyway. Shortly thereafter, Mr. LaRoche informed Ms. Limar that she would not be paid anything for teaching the Spanish class, despite the fact that she was working far more than 40 hours per week in order to perform both jobs. Upon learning that she would not be paid, Ms. Limar stepped down from her new position as a Spanish teacher. Just three days later, Ms. Kalifey-Aluise informed Ms. Limar that she was being put on a disciplinary Performance Improvement Plan for "not meeting the job standards of an Executive Assistant."

## VI.     CLAIMS FOR RELIEF

### COUNT 1
**Fourteenth Amendment's Equal Protection Clause of the United States Constitution**
**Pursuant to 42 U.S.C. § 1983**
*(Against all Defendants)*

85.     Dr. Cofield hereby incorporates all paragraphs of this Complaint.

86.     Title 42 U.S.C. Section 1983 is the jurisdictional vehicle appropriate to obtain relief for a violation of the United States Constitution.

87.     Dr. Cofield belongs to two protected classes: she is a Black female.

88.     Defendants treated Dr. Cofield differently than white males when, among other actions, she was subjected to adverse employment actions when Defendants paid her less than her white and/or male peers, refused to give her raises, and terminated her.

89.     This differential treatment was due to Dr. Cofield's membership in protected classes.

90.     Dr. Cofield was qualified for the positions she held.

91.     The unequal, and discriminatory, treatment of Dr. Cofield stemmed from Defendants' discriminatory intent.

92.     Individual defendants engaged personally in the deprivation of Dr. Cofield's constitutional rights as they perpetuated, and engaged in, the differential treatment, and although aware of the constitutional violations, did nothing to remedy the violations.

93.     Defendant KIPP, and all the Defendants in their Official Capacities, are liable because Defendant KIPP, and the final policymaker, Defendant Kalifey-Aluise, deprived Dr. Cofield of her constitutional rights, all actions taken against her were taken pursuant to an official policy and custom or practice of KIPP. Further, Defendants KIPP and Kalifey-Aluise failed to train and supervise Defendant LaRoche resulting in the constitutional deprivation. Further, KIPP failed to adopt necessary policies to ensure employees' constitutional rights were protected and fostered a pattern or practice of discrimination against individuals in protected classes.

94.     Defendants discriminated against Dr. Cofield pursuant to an official policy or Defendants LaRoche and Kalifey-Aluise, who had authority to institute corrective measures, had actual knowledge of discrimination, and responded with deliberate indifference.

95.     Defendants failed to intervene despite awareness of the unreasonable risk that Dr. Cofield's rights were being violated and were deliberately indifferent to that risk.

96.     Defendants' policy or custom was the moving force leading to the violation of Dr. Cofield's constitutional rights.

97.     Defendants' conduct violated the clearly established rights of Dr. Cofield, which reasonable persons in Defendants' position knew or should have known.

98.     Defendants failed to intervene despite awareness of the unreasonable risk that Dr. Cofield's rights were being violated and were deliberately indifferent to that risk.

99.     As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages, compensatory damages, and punitive damages against the individually-named Defendants, and she has incurred attorneys' fees and costs.

100.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

101.    The deprivation of Dr. Cofield's rights was undertaken by Defendants while acting under color of state law pursuant to official custom or policy.

102.    Defendants engaged in discrimination with malice or reckless indifference to Dr. Cofield's federally protected rights.

**COUNT 2**
**First Amendment Freedom of Speech and Association**
**Pursuant to 42 U.S.C. § 1983**
*(Against all Defendants)*

103.    Dr. Cofield hereby incorporates all paragraphs in this Complaint.

104.    Title 42 U.S.C. Section 1983 is the jurisdictional vehicle appropriate to obtain relief for a violation of the United States Constitution.

105.    Dr. Cofield exercised her right to freedom of speech as afforded by the First Amendment to the United States Constitution by speaking out about matters of public concern when she opposed gender and race discrimination based on pay inequity as to herself and other

Black female employees. She further exercised these rights by advocating for equitable pay for herself and other Black employees of KIPP.

106.    Dr. Cofield's protected speech was not made pursuant to her official job duties.

107.    Dr. Cofield associated with female Black employees to complain of race discrimination with respect to pay inequities.

108.    Defendants intentionally and willfully retaliated against Dr. Cofield for exercising her freedom of speech and association by subjecting her to illegal employment practices and policies including failing to pay her equal to her peers, refusing her requests for raises, and terminating her.

109.    Defendants' retaliatory conduct was substantially motivated by Dr. Cofield's exercise of freedom of speech and association.

110.    Dr. Cofield's interest in the speech outweighs the government's interest in the efficient provision of public service.

111.    Individual defendants engaged personally in the deprivation of Dr. Cofield's constitutional rights as they perpetuated, and engaged in, the differential treatment, and although aware of the constitutional violations, did nothing to remedy the violations.

112.    Defendant  KIPP, and all the Defendants in their Official Capacities, are liable because the final policymaker Kalifey-Aluise deprived Dr. Cofield of her constitutional rights, all actions taken against Dr. Cofield were taken pursuant to an official policy and custom or practice of KIPP, Defendants KIPP and Kalifey-Aluise failed to train and supervise the Defendant LaRoche resulting in the constitutional deprivation, KIPP failed to adopt necessary policies to protect employees' constitutional rights, and because there is a pattern or practice of retaliating against individuals who engage in activity protected by the First Amendment.

113.    Defendants took these actions against Dr. Cofield pursuant to an official policy or Defendants LaRoche and Kalifey-Aluise, who had authority to institute corrective measures, had actual knowledge of discrimination and retaliation, and responded with deliberate indifference.

114.    Defendants' policy or custom was the moving force leading to the violation of Dr. Cofield's constitutional rights.

115.    Defendants' conduct violated the clearly established rights of Dr. Cofield, which reasonable persons in Defendants' position knew or should have known.

116.    Defendants acted under color of state law, using a power possessed by virtue of state law, when depriving Dr. Cofield of her rights.

117.    Defendants failed to intervene despite awareness of the unreasonable risk that Dr. Cofield's rights were being violated and were deliberately indifferent to that risk.

118.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages, compensatory damages, punitive damages against the individually named Defendants, and has incurred attorneys' fees and costs.

119.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

120.    Defendants engaged in retaliation and discrimination with malice or reckless indifference to Dr. Cofield's federally protected rights.

**COUNT 3**
**Discrimination in Violation of Section 1981,**
**42 U.S.C. § 1981**
*(Against all Defendants)*

121.    Dr. Cofield incorporates all paragraphs alleged in this Complaint.

122.    For public entities, Title 42 U.S.C. Section 1983 is the jurisdictional vehicle appropriate to obtain relief for a violation of Title 42 U.S.C. § 1981 ("Section 1981").

123.    Dr. Cofield has at all times been qualified to perform her job responsibilities and performed them at all times at least satisfactory.

124.    Based on her race, Defendants denied Dr. Cofield, a Black woman, the protections against race discrimination provided by Section 1981 in the terms and conditions of her employment by denying her the same benefits, privileges, and terms and conditions of her contractual employment relationship that her white counterparts.

125.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her similarly situated white male counterparts by subjecting her to adverse treatment in the terms and conditions of employment because of her race, including but not limited to, paying her less than her male peers, refusing her requests for raises, and terminating her from her employment.

126.    This differential treatment was motivated by Dr. Cofield's race.

127.    Defendants discriminated against Dr. Cofield based on her race, denied her equal rights to make and enforce contracts, and denied her full and equal benefits of the laws.

128.    Defendant KIPP and Defendants LaRoche and Kalifey-Aluise, in their official capacities, are liable for the acts and/or omissions of its agents and employees. Defendants, either directly or by and through their agents, directly and proximately caused Dr. Cofield's severe injuries, damages, and losses.

129.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages and benefits, compensatory damages, including emotional distress, punitive damages and she has incurred attorneys' fees and costs.

130.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

131.    Defendants discriminated against Dr. Cofield pursuant to an official policy or Defendants LaRoche and Kalifey-Aluise, who had authority to institute corrective measures, had actual knowledge of discrimination and responded with deliberate indifference.

132.    The deprivation of Dr. Cofield's rights was undertaken by Defendants while acting under color of state law pursuant to official custom or policy.

133.    Defendants engaged in discrimination with malice or reckless indifference to Dr. Cofield's federally protected rights.

**COUNT 4**
**Retaliation in Violation of Section 1981**
**Pursuant to 42 U.S.C. § 1983**
*(Against all Defendants)*

134.    Dr. Cofield incorporates all paragraphs alleged in this Complaint

135.    For public entities, Title 42 U.S.C. Section 1983 is the jurisdictional vehicle appropriate to obtain relief for a violation of Title 41 U.S.C. Section 1981.

136.    Dr. Cofield engaged in protected activity when she opposed and complained of the racially discriminatory practices observed, as well as those personally experienced, in her employment. Dr. Cofield also engaged in protected activity when she tried to rectify this discrimination with advocacy and other efforts to achieve equal pay for female Black employees (herself and others) by her to achieve equal pay for female Black employees (herself and others).

137.    Dr. Cofield believed in good faith that her complaints were regarding discrimination on the basis of race as prohibited by federal law.

138.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her similarly situated white counterparts by subjecting her to adverse treatment in the terms and conditions of employment because of her gender and race, including

but not limited to, paying her less than her white peers, refusing her requests for raises, and terminating her from her employment.

139.    Defendants' actions were motivated by Dr. Cofield's protected activities.

140.    Dr. Cofield was treated less favorably than employees who did not engage in protected activities.

141.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages and benefits, compensatory damages, including emotional distress, and punitive damages, and she has incurred attorneys' fees and costs.

142.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

143.    Defendants retaliated against Dr. Cofield pursuant to an official policy or Defendants LaRoche and Kalifey-Aluise, who had authority to institute corrective measures, had actual knowledge of retaliation and responded with deliberate indifference.

144.    The deprivation of Dr. Cofield's rights was undertaken by Defendants while acting under color of state law pursuant to official custom or policy.

145.    Defendants engaged in retaliation with malice or reckless indifference to Dr. Cofield's federally protected rights.

**COUNT 5**
**Discrimination in Violation of**
**Section 601, Title VI of the Civil Rights Act of 1964,**
**42 U.S.C. §2000d**
*(Against Defendant KIPP and all individually named defendants in their official capacity)*

146.    Dr. Cofield incorporates all paragraphs alleged in this Complaint.

147.     At all times relevant to this Complaint, KIPP received federal financial assistance. the primary objective of the federal financial assistance received by KIPP was for the purpose of providing employment.

148.     Dr. Cofield is Black, a protected class under Title VI.

149.     Dr. Cofield has at all times been qualified to perform her job responsibilities and performed them at all times at least satisfactory.

150.     Defendants used the federal funding to intentionally engage in discriminatory activities, including, paying Dr. Cofield less than white employees, refusing Dr. Cofield's requests for raises, and subjecting Dr. Cofield to termination without valid justification.

151.     Defendants also intentionally treated Dr. Cofield, and other Black employees, worse than their white peers.

152.     Defendants discriminated against Dr. Cofield pursuant to an official policy or Defendants LaRoche and Kalifey-Aluise, who had authority to institute corrective measures, had actual knowledge of discrimination, and responded with deliberate indifference.

153.     Defendant KIPP and Defendants LaRoche and Kalifey-Aluise in their official capacities are liable for the acts and/or omissions of its agents and employees. Defendants, either directly or by and through their agents, directly and proximately caused Dr. Cofield's severe injuries, damages, and losses.

154.     Defendants engaged in retaliation with malice or reckless indifference to Dr. Cofield's federally protected rights.

155.     As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages and benefits, compensatory damages, including emotional distress, and punitive damages, and she has incurred attorneys' fees and costs.

**COUNT 6**
**Retaliation in Violation of**
**Section 601, Title VI of the Civil Rights Act of 1964,**
**42 U.S.C. §2000d**
*(Against Defendant KIPP and all individually named defendants in their official capacity)*

156.    Dr. Cofield incorporates all paragraphs alleged in this Complaint.

157.    Dr. Cofield engaged in protected activity when she opposed and complained of the racially discriminatory practices observed, as well as those personally experienced, in her employment. Dr. Cofield opposed and complained of the discriminatory practices observed, as well as those personally experienced, in her employment. Dr. Cofield also engaged in protected activity when she tried to rectify this discrimination with advocacy and other efforts to achieve equal pay for female Black employees (herself and others) by her to achieve equal pay for female Black employees (herself and others).

158.    Dr. Cofield believed in good faith that her complaints were regarding discrimination on the basis of race as prohibited by federal law.

159.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her counterparts who did not engage in protected activity by subjecting her to adverse treatment in the terms and conditions of employment because of her gender and race, including but not limited to, paying her less than her white peers, refusing her requests for raises, and terminating her from her employment.

160.    Defendants' actions were motivated by Dr. Cofield's protected activities.

161.    Defendants retaliated against Dr. Cofield pursuant to an official policy or Defendants LaRoche and Kalifey-Aluise, who had authority to institute corrective measures, had actual knowledge of discrimination, and responded with deliberate indifference.

162.    Defendants engaged in retaliation with malice or reckless indifference to Dr. Cofield's federally protected rights.

163.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages and benefits, compensatory damages, including emotional distress, and punitive damages, and she has incurred attorneys' fees and costs.

**COUNT 7**
**Discrimination in Violation of**
**Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §2000e**
*(Against all Defendant KIPP and all individually named defendants in their official capacity)*

164.    Dr. Cofield repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

165.    Dr. Cofield belongs to two protected classes based on her race (Black) and gender (female).

166.    Dr. Cofield has at all times been qualified to perform her job responsibilities and performed them at all times at least satisfactory.

167.    Based on her race and gender, Defendants denied Dr. Cofield, a Black woman, the protections against race and gender discrimination provided by Title VII in the terms and conditions of her employment by denying her the same benefits, privileges, and terms and conditions of her contractual employment relationship that her white and male counterparts.

168.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her similarly situated white and male counterparts by subjecting her to adverse treatment in the terms and conditions of employment because of her race and gender, including but not limited to, paying her less than her white and male peers, refusing her requests for raises, and terminating her from her employment.

169.    This differential treatment was motivated by Dr. Cofield's race and gender.

170.    Defendants discriminated against Dr. Cofield based on her race and gender, denied her equal rights to make and enforce contracts, and denied her full and equal benefits of the laws.

171.    Defendant KIPP, and Defendants LaRoche and Kalifey-Aluise, in their official capacities, are liable for the acts and/or omissions of its agents and employees. Defendants, either directly or by and through their agents, directly and proximately caused Dr. Cofield's severe injuries, damages, and losses.

172.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages and benefits, compensatory damages, including emotional distress, and punitive damages, and she has incurred attorneys' fees and costs.

173.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

**COUNT 8**
**Retaliation in Violation of**
**Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §2000e**
*(Against Defendant KIPP and all individually-named defendants in their official capacity)*

174.    Dr. Cofield repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

175.    Dr. Cofield engaged in protected activity when she opposed and complained of the practices that were discriminatory against Black women. These included KIPP's practices that she observed, as well as those personally experienced, during her employment. Dr. Cofield also engaged in protected activity when she tried to rectify this discrimination with advocacy and other efforts to achieve equal pay for female Black employees (herself and others) by her to achieve equal pay for female Black employees (herself and others).

176.    Dr. Cofield believed in good faith that her complaints were regarding discrimination on the basis of race as prohibited by federal law.

177.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her similarly situated white counterparts by subjecting her to adverse treatment in the terms and conditions of employment because of her gender and race, including but not limited to, paying her less than her white peers, refusing her requests for raises, and terminating her from her employment.

178.    Defendants' actions were motivated by Dr. Cofield's protected activities.

179.    Dr. Cofield was treated less favorably than employees who did not engage in protected activities.

180.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages and benefits, compensatory damages, and punitive damages against the individually-named Defendants, and she has incurred attorneys' fees and costs.

**COUNT 9**
**Consolidated Omnibus Budget Reconciliation Act ("COBRA") and the Employment Income Retirement Security Act ("ERISA")**
*(Defendant KIPP and individually-named Defendants in their official capacity)*

181.    Dr. Cofield incorporates all paragraphs alleged in this Complaint.

182.    Defendants sponsor a group health plan, which is a covered health plan under the Employee Retirement Income Security Act ("ERISA").

183.    Dr. Cofield is a qualified beneficiary under KIPP's health plan (the "Health Plan") because she was a covered individual of the group health plan during her employment.

184.    Dr. Cofield suffered a qualifying event when was wrongfully terminated from her employment by Defendants as she was terminated for reasons other than gross misconduct on January 8, 2021.

185.    Defendant was required to provide notice of coverage within 14 days of the termination, and that notice was required to include fourteen categories of information as required by 29 CFR § 2590.606-4(b)(4).

186.    Finally, on June 7, 2021, 137 days late, Dr. Cofield first received notice regarding her rights under COBRA.

187.    Dr. Cofield suffered economic losses as a result of the failure to provide notice of her right to continued coverage.

**COUNT 10**
**American Rescue Plan Act of 2021 ("ARPA")**
*(Against KIPP and individually-named defendants in their official capacity)*

188.    Dr. Cofield incorporates all paragraphs alleged in this Complaint.

189.    As described *supra*, KIPP and Dr. Cofield had certain rights and obligations under COBRA and ERISA. As a result, both fall under the purview of the newly enacted ARPA.

190.    The ARPA provides for an employer-paid COBRA subsidy whereby employers must cover 100% of an employee's cost of continuing group health coverage (including medical, dental, and vision coverage) from April 1, 2021, through September 30, 2021.

191.    The ARPA requires employer-paid coverage for Dr. Cofield, as she lost her health care coverage on account of an involuntary termination on January 8, 2021.

192.    ARPA became effective on April 1, 2021, and required that employers provide notices to all employees subjected to involuntary termination as far back as October 2019.

193.    The ARPA required employers to give notice to these individuals by May 31, 2021, and that notice had to occur regardless of whether an individual requested that notice.

194.    Finally, 7 days late, on June 7, 2021, Dr. Cofield first received notice regarding her rights under the ARPA.

195.    As a result of the failure to provide timely notice, Dr. Cofield suffered economic losses as a result of the failure to provide Dr. Cofield notice of her right to continued coverage.

## COUNT 11
### Discrimination in Violation of La. R.S. 23:332(A)(1)
*(Against Defendant KIPP and individually-named defendants in their official capacities)*

196.    Dr. Cofield incorporates all paragraphs alleged in this Complaint.

197.    Dr. Cofield belongs to two protected classes: she is Black and she is female.

198.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her similarly situated white male counterparts by subjecting her to adverse treatment in the terms and conditions of employment because of her gender and race, including but not limited to, paying her less than her male peers, refusing her requests for raises, and terminating her from her employment.

199.    This differential treatment was motivated by Dr. Cofield's membership in protected classes.

200.    Dr. Cofield was qualified for the positions she held.

201.    Defendant KIPP and Defendants LaRoche and Kalifey-Aluise in their official capacities are liable for the acts and/or omissions of its agents and employees. Defendants, either directly or by and through their agents, directly and proximately caused Dr. Cofield's severe injuries, damages, and losses.

202.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages, and emotional damages.

203.    Defendant's unlawful and discriminatory conduct in violation of La. R.S. 23:332(A)(1) was outrageous and malicious, was intended to Dr. Cofield, and was done with conscious disregard of Dr. Cofield's civil rights, entitling Dr. Cofield to an award of attorneys' fees under La. R.S. 23:303.

## COUNT 12
## Retaliation in Violation of La. R.S. 23:332(A)(2)
### *(Against Defendant KIPP, and individually-named defendants in their official capacities)*

204.    Dr. Cofield incorporates all paragraphs alleged in this Complaint

205.    At all relevant times, Dr. Cofield was well qualified for her position.

206.    Dr. Cofield opposed and complained of the discriminatory practices observed, as well as those personally experienced, in her employment. Dr. Cofield also tried to rectify this discrimination with advocacy and other efforts to achieve equal pay for female Black employees (herself and others) by her to achieve equal pay for female Black employees (herself and others).

207.    Dr. Cofield believed in good faith that her complaints were regarding discrimination the basis of race and gender as prohibited by Louisiana law.

208.    Defendants subjected Dr. Cofield to adverse employment actions and treated Dr. Cofield less favorably than her similarly situated white male counterparts by subjecting her to adverse treatment in the terms and conditions of employment because of her gender and race, including but not limited to, paying her less than her male peers, refusing her requests for raises, and terminating her from her employment.

209.    Defendants' actions were motivated by Dr. Cofield's protected activities.

210.    Dr. Cofield was treated less favorably than employees who did not engage in protected activities.

211.    Defendants unlawful and retaliatory conduct in violation of La. R.S. 23:332(A)(2) was outrageous and malicious, was intended to injure the plaintiff, and was done in conscious disregard of plaintiffs' civil rights, entitling the plaintiff to an award of attorneys' fees under La.R.S. 23:3030.

212.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages, and emotional damages.

213.    Defendant KIPP and Defendants Laroche and Kalifey-Aluise in their official capacities are liable for the acts and/or omissions of its agents and employees. Defendants, either directly or by and through their agents, directly and proximately caused Dr. Cofield's severe injuries, damages, and losses.

## COUNT 13
### Discrimination in Violation of
### Article 1, Section 3 and Section 12 of Louisiana Constitution of 1974
### *(Against all Defendants)*

214.    Dr. Cofield hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

215.    Under the Louisiana Constitution: "No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations."

216.    Dr. Cofield further has a right to be free from discrimination based on race or gender in all public areas and facilities.

217.    As a Black female, Dr. Cofield belongs to several protected classes.

36

218.    Defendants treated Dr. Cofield differently than white males when, among other actions, she was subjected to adverse employment actions when she was paid less than her male peers, refused raises, and terminated.

219.    This differential treatment was due to Dr. Cofield's membership in protected classes.

220.    Dr. Cofield was qualified for the positions she held.

221.    The unequal, and discriminatory, treatment of Dr. Cofield stemmed from Defendants' discriminatory intent.

222.    The individual Defendants engaged personally in the deprivation of Dr. Cofield's constitutional rights as they perpetuated, and engaged in, the differential treatment, and although aware of the constitutional violations, did nothing to remedy the violations.

223.    Defendant KIPP, and all the Defendants in their Official Capacities, are liable because Defendant the final policymaker Kalifey-Aluise deprived Dr. Cofield of her constitutional rights, all actions taken against her were taken pursuant to an official policy and custom or practice of KIPP. Further, Defendants KIPP and Kalifey-Aluise failed to train and supervise Defendant LaRoche resulting in the constitutional deprivation. Further, KIPP failed to adopt necessary policies to ensure employees' constitutional rights were protected and fostered a pattern or practice of discrimination against individuals in protected classes.

224.    Defendants failed to intervene despite awareness of the unreasonable risk that Dr. Cofield's rights were being violated and were deliberately indifferent to that risk.

225.    Defendants' policy or custom was the moving force leading to the violation of Dr. Cofield's constitutional rights.

226.    Defendants' conduct violated the clearly established rights of Dr. Cofield, which reasonable persons in Defendants' position knew or should have known.

227.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages, compensatory and special damages, attorneys' fees, and costs.

228.    Defendants acted under color of state law, using a power possessed by virtue of state law, when depriving Dr, Cofield of her rights.

229.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

**COUNT 14**
**Freedom of Speech and Association,**
**Article I, Section 7, and Section 9 of the Louisiana Constitution,**
***(Against all Defendants)***

230.    Dr. Cofield hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

231.    Under the Louisiana Constitution: "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom."

232.    Further, Dr. Cofield has the right to petition for redress of her grievances.

233.    Dr. Cofield exercised her right to freedom of speech as afforded by the Louisiana Constitution by speaking out about matters of public concern when she opposed gender and race discrimination based on pay inequity as to herself and other Black female employees. She further exercised these rights by advocating for equitable pay for herself and other Black employees of KIPP.

234.    Dr. Cofield's protected speech was not made pursuant to her official job duties.

235.    Dr. Cofield associated with female Black employees to complain of race discrimination with respect to pay inequities.

236.    Defendants intentionally and willfully retaliated against Dr. Cofield for exercising her freedom of speech and association by subjecting her to illegal employment practices and policies including failing to pay her equal to her peers, refusing her requests for raises, and terminating her.

237.    Defendants' retaliatory conduct was substantially motivated by Dr. Cofield's exercise of freedom of speech and association.

238.    Dr. Cofield's interest in the speech outweighs the government's interest in the efficient provision of public service.

239.    Defendant KIPP, and all the Defendants in their Official Capacities, are liable because the final policymaker Kalifey-Aluise deprived Dr. Cofield of her constitutional rights, all actions taken against Dr. Cofield were taken pursuant to an official policy and custom or practice of KIPP, Defendants KIPP and Kalifey-Aluise failed to train and supervise the Defendant LaRoche resulting in the constitutional deprivation, KIPP failed to adopt necessary policies to protect employees' constitutional rights, and because there is a pattern or practice of retaliating against individuals who engage in activity protected by the First Amendment.

240.    Defendants' policy or custom was the moving force leading to the violation of Dr. Cofield's constitutional rights.

241.    Defendants' conduct violated the clearly established rights of Dr. Cofield, which reasonable persons in Defendants' position knew or should have known.

242.    Defendants failed to intervene despite awareness of the unreasonable risk that Dr. Cofield's rights were being violated and were deliberately indifferent to that risk.

243.    As a result of Defendants' misconduct, Dr. Cofield suffered damages, including lost wages, compensatory and special damages, attorneys' fees, and costs.

244.    The conduct of the Defendants in their individual capacities violated Dr. Cofield's clearly established rights.

**COUNT 15**
**Discrimination and Retaliation in Violation of the**
**Louisiana Human Rights Act**
*(Against Defendant KIPP and the individually named defendants in their official capacities)*

245.    Dr. Cofield hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

246.    The Louisiana Human Rights Act ("LHRA") is intended to "safeguard all individuals within the state from discrimination because of . . . race . . .[or] sex . . . in connection with employment . . . ; to protect their interest in personal dignity and freedom from humiliation; to make available to the state their full productive capacities in employment . . .; and to further the interest, rights, and privileges within the state." La. R.S. § 51:2231.

247.    The LHRA makes it unlawful for an employer, as defined by LEDL, "[t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this Chapter or by [LEDL]," La. R.S. § 51:2256, and provides civil remedies for "any person deeming himself injured by" such unlawful conduct. La. R.S. § 51:2264.

248.    At all times relevant to this action, the LHRA has been in full force and effect and has applied to Defendants' conduct.

249.    As set forth above, Defendants discriminated against Dr. Cofield on the basis of her gender and race in connection with her employment, as prohibited by the LHRA.

250.    Defendants retaliated against Dr. Cofield because of her complaints regarding race and gender discrimination, and efforts by her to achieve equal pay for female Black employees

(herself and others) at KIPP, when they paid her less than her peers, denied her requests for a raise, and terminated her employment.

251.    Defendant engaged in conduct materially adverse to a reasonable employee and took adverse employment actions against Dr. Cofield.

252.    The adverse actions taken against Dr. Cofield were in retaliation for complaints regarding race and gender discrimination and were motivated by retaliatory animus.

253.    Defendants are liable for the acts and/or omissions of their agents and employees. Defendants, either directly or by and through their agents, directly and proximately caused Dr. Cofield's severe injuries, damages, and losses.

254.    As a result of Defendants' retaliation, Dr. Cofield has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL and the LHRA.

255.    Defendants' unlawful and retaliatory conduct in violation of La. R.S. 23:332(A)(2) was outrageous and malicious, was intended to injure Dr. Cofield, and was done in conscious disregard of Dr. Cofield's civil rights, entitling Dr. Cofield to an award of attorneys' fees under La. R.S. 23:3030.

**COUNT 16**
**Supplemental State Law Action Against Insurance**
**(Against Defendant The Hanover Insurance Company)**

256.    Dr. Cofield hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

257.    Defendant Insurer provided a contract of insurance to Defendant KIPP that is applicable to the claims asserted herein.

258.    The above-named Defendant Insurer liable for the actions of its insured, and its employees pursuant to La. R.S. 22:1269.

259.    The policy issued and currently in effect covers conduct of one or more of the named defendants and obligates the insurer jointly and/or severally, to pay on behalf of or to indemnify one or more of the named defendants any sums the insureds may become obligated to pay Plaintiff.

260.    Because of their conduct, defendants are liable to Plaintiff for all damages and injuries she has suffered as a result.

261.    Defendant Insurer is contractually obligated to pay these sums on behalf of the insureds or are obligated to indemnify the insureds for these sums.

262.    Pursuant to Louisiana Revised Statute 22:655(B), Plaintiffs bring a direct action against Defendant Insurer to recover any and all sums they are obligated to pay Plaintiffs on behalf of their insureds or to indemnify their insureds.


## VII.    RELIEF REQUESTED

WHEREFORE Plaintiff Naressa Cofield requests judgment be entered against Defendants and that the Court grant the following:

a.   Declaratory relief;

b.   Injunctive relief;

c.   Judgment against Defendants for Plaintiff's asserted causes of action;

d.   Special damages;

e.   Damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, lost promotions, and other employment opportunities;

42

f.   Award of compensatory damages including for emotional distress;

g.   Costs of medical expenses;

h.   An order for Defendants to reinstate Dr. Cofield or, in the alternative, to pay for front-pay and benefits;

i.   Punitive damages;

j.   Civil penalties;

k.   Award of treble damages;

l.   Award of liquidated damages;

m.   Award costs and attorneys' fees;

n.   Pre- and post-judgment interest; and

o.   Order such other and further relief, at law or in equity, to which Dr. Cofield may be justly entitled.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

/s/      Casey Denson
**Casey Rose Denson (La. Bar #33363)**
**Justine G. Daniel (La. Bar #36856)**
**CASEY DENSON LAW, LLC**
4601 Dryades Street
New Orleans, LA 70115
Phone: (504) 224-0110
Fax: (504) 534-3380
cdenson@caseydensonlaw.com
jdaniel@caseydensonlaw.com
*Attorneys for Plaintiff Naressa Cofield*